UNITED STATES DISTRICT COURT   FILED
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY D/B/A AT&T CONNECTICUT, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| ANTHONY J. PALERMINO, KEVIN M. DELGOBBO and JOHN W. BETKOSKI, III (in their official capacity, and not as individuals), SPRINT COMMUNICATIONS COMPANY L.P., SPRINT SPECTRUM L.P. and NEXTEL COMMUNICATIONS OF THE MID-ATLANTIC, INC. | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Case No.  2009 OCT 19 P 3:52
3:09CV1672 (SRU)
U.S. DISTRICT COURT
HARTFORD, CT.

**309CV 1672 SRU**

**OCTOBER 19, 2009**

## COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF

The Southern New England Telephone Company d/b/a AT&T Connecticut ("AT&T Connecticut") brings this action for declaratory, injunctive and other relief and alleges as follows:

### INTRODUCTION

1.      AT&T Connecticut brings this action to challenge a determination made by the Connecticut Department of Public Utility Control ("DPUC"), acting through its Commissioners, in requiring AT&T Connecticut, purportedly pursuant to a requirement of the Federal Communications Commission ("FCC"), to extend for three years its terminated interconnection agreements ("ICAs") with Defendants Sprint Communications Company L.P., Sprint Spectrum L.P., and Nextel Communications of the Mid-Atlantic.

2.     The challenged DPUC determination, and the resulting extensions of the ICAs,
are contrary to the FCC requirement the DPUC purported to enforce.  AT&T Connecticut seeks
declaratory, injunctive and other relief to set aside the challenged DPUC determination.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201
and 2202.

4.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5.     AT&T Connecticut is a corporation organized under the laws of the State of
Connecticut, with its principal place of business in Connecticut.  AT&T Connecticut is a wholly
owned subsidiary of AT&T Teleholdings, Inc., which is wholly owned by AT&T Inc.  AT&T
Connecticut provides, among other things, telecommunications services, including local
exchange services, and information services within Connecticut.  AT&T Connecticut is an
"incumbent local exchange carrier," as that term is defined in § 251(h) of the
Telecommunications Act of 1996 ("1996 Act"), in its authorized service areas in Connecticut.

6.     Sprint Communications Company L.P. ("Sprint CLEC"), a Delaware limited
partnership, is a competitive local exchange carrier under the Telecommunications Act of 1996
("1996 Act"), and an interexchange carrier, and is certified to provide telecommunications
services in Connecticut.

7.     Sprint Spectrum L.P. ("Sprint PCS"), a Delaware limited partnership, provides
commercial mobile radio service ("CMRS") (wireless service) in Connecticut as agent and
General Partner for WirelessCo, L.P., a Delaware limited partnership.

8.     Nextel Communications of the Mid-Atlantic, Inc. ("Nextel"), a Delaware
Corporation, provides CMRS in Connecticut.

9.     Sprint CLEC, Sprint PCS, and Nextel are affiliates and are referred to herein collectively as "Sprint."

10.    The DPUC is a "State commission" within the meaning of sections 153(41), 251 and 252 of the 1996 Act.

11.    Defendants Anthony J. Palermino, Kevin M. DelGobbo and John W. Betkoski III are Commissioners of the DPUC. They are named as Defendants in their official capacities, and not as individuals.

## BACKGROUND

### The Telecommunications Act of 1996: Interconnection Agreements

12.    The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified at 47 U.S.C. § 151 *et seq.*), which amended the Communications Act of 1934, introduced a competitive regime for local telecommunications services, which was previously provided primarily by a single company within each local area. To that end, the 1996 Act requires incumbent local exchange carriers ("incumbent LECs" or "ILECs"), such as AT&T Connecticut, to enter into "interconnection agreements" ("ICAs") with competitive local exchange carriers ("CLECs"), such as Sprint CLEC, and with CMRS providers, such as Sprint PCS and Nextel. These agreements establish terms and conditions on which ILECs provide their competitors with, among other things, interconnection with the incumbent's network, so that traffic can flow between the carriers' networks (47 U.S.C. § 251(c)(2)), the use of individual elements of the incumbent's network on an "unbundled" basis, so that competitors can serve their customers without having to build their own networks from scratch (*id.* § 251(c)(3)), and telecommunications services at wholesale rates, for competitors to resell at retail (*id.* § 251(c)(4)). Section 252(d) sets forth the pricing standards for, among other things, interconnection, unbundled network elements and resale services. *Id.* § 252(d).

9233814.1 07-Oct-09 09:32 07155091     3

13.     In the 1996 Act, Congress established procedures by which a competing LEC or CMRS provider may arrive at an ICA with an incumbent LEC for the performance of the substantive requirements imposed by the 1996 Act. Generally, the competing LEC or CMRS provider requests the incumbent LEC to negotiate the terms of an ICA. 47 U.S.C. § 252(a)(1). The parties may then arrive at an ICA through negotiation. *Id.* If the parties are unable to arrive at complete agreement, either party to the negotiation may petition the state utility commission to arbitrate the parties' disagreements. *Id.* § 252(b)(1). Parties to an ICA, whether fully negotiated or arbitrated, submit the ICA to the State commission, which then approves or rejects the agreement in accordance with the criteria set forth in the 1996 Act. *Id.* § 252(e).

14.     Although carriers are free to negotiate identical ICAs in multiple states, ICAs made under the 1996 Act are typically state-specific, in the sense that each ICA is approved for, and pertains to, a particular state.

### The 2006 FCC Merger Commitments

15.     In 2006, the Federal Communications Commission ("FCC") issued an Order approving a merger between AT&T Inc. and BellSouth Corporation ("BellSouth"). That Order established a method, not contemplated by the 1996 Act, by which competing carriers can extend their interconnection agreements for three years beyond the terms stated in those ICAs.

16.     Specifically, AT&T Inc. and BellSouth, as a condition to obtaining the FCC's approval of their merger, made certain commitments to the FCC. One of these commitments ("Merger Commitment 7.4") provides:

> The AT&T/BellSouth ILECs shall permit a requesting telecommunications carrier to extend its current interconnection agreement, regardless of whether its initial term has expired, for a period of up to three years, subject to amendment to reflect prior and future changes of law.

17.    The FCC issued an Order approving the merger between AT&T Inc. and BellSouth, and that Order required AT&T ILECs, including AT&T Connecticut, to comply with the merger commitments, including Merger Commitment 7.4.

### Sprint's Interconnection Agreements

18.    As of August, 2007, each of Nextel, Sprint CLEC and Sprint PCS had its own interconnection agreement with AT&T Connecticut.

19.    The Nextel ICA went into effect in September, 1998. Its stated term expired in September, 2000, but as of August, 2007, Nextel and AT&T Connecticut were still operating under the ICA pursuant to provisions in the ICA that provided for the ICA to remain in effect after its stated term expired. Excerpts of the Nextel ICA are Exhibit 1 hereto.

20.    The Sprint CLEC ICA went into effect in October, 2002. Its stated term expired in November, 2004, but as of August, 2007, Nextel and AT&T Connecticut were still operating under the ICA pursuant to provisions in the ICA that provided for the ICA to remain in effect after its stated term expired. Excerpts of the Sprint CLEC ICA are Exhibit 2 hereto.

21.    The Sprint PCS ICA went into effect in September, 2003. Its stated term expired in November, 2004, but as of August, 2007, Nextel and AT&T Connecticut were still operating under the ICA pursuant to provisions in the ICA that provided for the ICA to remain in effect after its stated term expired. Excerpts of the Sprint PCS ICA are Exhibit 3 hereto.

22.    Although all three ICAs remained in effect after their stated terms expired, all three were, on their terms, thereafter subject to termination upon notice. AT&T Connecticut gave Sprint the required notice, for all three contracts on August 21, 2007.

23.     On August 31, 2007, Sprint responded to AT&T Connecticut's termination notice by requesting negotiation of successor ICAs under section 252(a)(1) of the Telecommunications Act of 1996.

24.     As of June 30, 2008, ten months after Sprint requested negotiations, the Nextel ICA, the Sprint CLEC ICA, and the Sprint PCS ICA no longer existed as effective contracts. Specifically:

25.     The Nextel ICA, by its terms, terminated on November 19, 2007, ninety days after AT&T gave notice of termination.

26.     The Sprint CLEC ICA, by its terms, terminated on June 30, 2008, pursuant to a provision in the ICA that provided for termination ten months after the date (August 31, 2007) on which AT&T Connecticut received Sprint CLEC's Section 252(a)(1) request for negotiations.

27.     The Sprint PCS ICA, by its terms, terminated on June 30, 2008, pursuant to a provision in the ICA that provided for termination ten months after the date (August 31, 2007) on which AT&T Connecticut received Sprint CLEC's Section 252(a)(1) request for negotiations.

## Sprint's Request To Extend the Terminated ICAs

28.     On March 30, 2009, Sprint notified AT&T Connecticut that it wished to extend its terminated ICAs for three years under Merger Commitment 7.4. When Sprint made that request, the Nextel ICA, the Sprint CLEC ICA and the Sprint PCS ICA had all been terminated, no longer existed as contracts, and were not "current interconnection agreements" within the meaning of Merger Commitment 7.4.

29.     On April 13, 2009, AT&T Connecticut properly denied Sprint's request to extend under Merger Commitment 7.4 the terminated ICAs.

## Proceedings in the DPUC

30.     On May 21, Sprint filed in DPUC Docket No. 07-12-19, a DPUC proceeding in

which had Sprint initially sought relief relating to another merger commitment, a motion for

leave to file an Amended Application alleging that AT&T Connecticut's denial of Sprint's ICA

extension request violated Merger Commitment 7.4. The DPUC reopened the docket, under

Docket No. 07-12-19RE01, and granted Sprint's motion to file the Amended Application.

31.     The DPUC received briefs from Sprint and AT&T Connecticut in Docket No. 07-

112-19RE01 and issued its Decision on September 16, 2009.

32.     In its briefs, AT&T Connecticut argued that Sprint was not entitled to extend the

terminated ICAs for two separate reasons: First, that Merger Commitment 7.4 applies only to

current interconnection agreements, and the former ICAs that were the subject of Sprint's

Amended Application were not current interconnection agreements; and, second, that the three-

year extension permitted by Merger Commitment 7.4, when it is applied to a current ICA, begins

with the expiration of the stated term of the ICA, and therefore could not apply to Sprint's ICAs,

because their stated terms ended more than three years ago. AT&T Connecticut raises only the

first of these two reasons in this challenge to the DPUC's Decision.

33.     In the Decision, the DPUC granted Sprint's request and ordered AT&T

Connecticut to "file a revised interconnection agreement with an expiration date of three years

from the effective Date of this Decision." The DPUC noted AT&T Connecticut's argument that

"Merger Commitment 7.4 applies only to current interconnection agreements, and the former

ICAs that are the subject of the Amended Application are not current interconnection agreements

within the meaning of Merger Commitment 7.4." The DPUC did not, however, address that

argument. Rather, the DPUC stated only:

> The Department is not persuaded by [AT&T Connecticut's] argument that
> Merger Commitment 7.4 no longer applies. . . . Merger Commitment 7.4

permits the "current" agreement to be extended for a period of up to three years, "regardless of whether its initial term has expired." The Department also finds that the Merger Agreements (sic; should say "Merger Commitments") are to be in effect 42 months from the merger closing date, or June 29, 2010. In the instant proceeding, Sprint has requested to extend its existing ICA with [AT&T Connecticut] for an additional three year term by its March 30, 2009 letter to AT&T. Since this request has been made within the 42-month period established within the Merger Conditions, the Department finds that the Sprint/[AT&T Connecticut] ICA should be extended. (Footnotes omitted.)

34.     The DPUC's observation that "Merger Commitment 7.4 permits the 'current' agreement to be extended . . . 'regardless of whether its initial term has expired'" has no bearing on AT&T Connecticut's position that Sprint's ICAs were not current because they had been terminated. While it is correct that the stated terms of Sprint's ICAs had expired, that is separate and apart from the fact that the ICAs had also terminated for the reasons set forth in paragraphs 22 through 27 above.

35.     The DPUC's observation that the merger commitments were to be in effect until June 29, 2010 is irrelevant to the question whether the ICAs that Sprint sought to extend were current and therefore eligible for extension under Merger Commitment 7.4, as is the fact that Sprint made its extension request during the 42-month period during which the merger commitments were to be in effect.

36.     The DPUC's decision was inconsistent with Merger Commitment 7.4 and therefore contrary to federal law.

37.     On September 30, 2009, in compliance with the Decision, AT&T Connecticut filed with the Department amendments extending the Nextel, Sprint CLEC and Sprint PCS ICAs for three years, starting September 16, 2009.

## Count One
## Unlawful Application of Merger Commitment 7.4

38.     AT&T Connecticut repeats paragraphs 1 through 37 as if fully set forth herein.

39.     The DPUC misapplied and thereby violated Merger Commitment 7.4, and in so doing violated federal law.

40.     AT&T Connecticut is entitled to declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, AT&T Connecticut respectfully requests that this Court grant it the following relief:

(a)     Declare that the DPUC violated Merger Commitment 7.4 as set forth above;

(b)     Enjoin Defendants from enforcing the provisions in the amended ICAs that extend the ICAs for three years pursuant to the Department's unlawful Decision; and

(c)     Award AT&T Connecticut such other and further relief as the Court deems just and proper.

Dated:  October 19, 2009                    Respectfully submitted,

                                            By: _____
                                            Timothy P. Jensen (ct18888)
                                            Amy E. Drega (ct27974)
                                            Hinckley Allen & Snyder LLP
                                            20 Church Street
                                            Hartford, CT  06103
                                            tjensen@haslaw.com
                                            adrega@haslaw.com

                                            Theodore A. Livingston
                                            Dennis G. Friedman
                                            J. Tyson Covey
                                            Mayer Brown LLP
                                            71 S. Wacker Drive
                                            Chicago, IL 60606
                                            (312) 782-0600

                                            *Attorneys for AT&T Connecticut*

# Exhibit 1

AGREEMENT FOR NETWORK INTERCONNECTION

BETWEEN

THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY

AND

NEXTEL COMMUNICATIONS OF THE MID ATLANTIC, INC.

## 13. TERM AND TERMINATION

13.1  The initial term of this Agreement shall be two (2) years ("the Term") which shall commence on the Effective Date.  Absent the receipt by one Party of written notice from the other Party at least sixty (60) days prior to the expiration of the Term to the effect that such Party does not intend to extend the Term, this Agreement shall automatically renew and remain in full force and effect on or after the expiration of the Term until termination by either Party in accordance with Section 13.3.

13.2  Except as otherwise provided for herein, either Party may terminate this Agreement in the event that the other Party: (1) fails to pay any amount due hereunder (excluding Disputed Amounts pursuant to Section 29) and fails to cure such nonpayment within sixty (60) days; (2) fails to implement the outcome of Dispute Resolution as detailed in Section 28 of this Agreement.  In the event of the breach or noncompliance of any portion of this Agreement, the Parties agree to implement the Dispute Resolution process as detailed in Section 28 of this Agreement;  or (3) is insolvent or has initiated, or has initiated against it, bankruptcy or receivership proceedings.

13.3  If pursuant to Section 13.1 this Agreement continues in full force and effect after the expiration of the Term, either Party may terminate this Agreement ninety (90) days after delivery of written notice to the other Party of its intent to terminate the Agreement.

13.4  Termination of this Agreement shall not release either Party from any liability which at the time of termination has already accrued to the other Party or which thereafter may accrue in respect of any act or omission prior to termination or from any obligation which is expressly stated herein to survive termination.

## 14. FORCE MAJEURE

Neither Party shall be liable for any delay or failure in performance of any part of this Agreement caused by a force majeure condition, including fires, severe weather conditions, strikes, work stoppages, embargoes, explosions, power blackouts, earthquakes, volcanic action, floods, wars, water, the elements, labor disputes, civil disturbances, government requirements, acts of civil or military authorities, acts of God, acts of a public enemy, acts or omissions of transportation common carriers, inability to secure raw materials, inability to secure product of manufacturers or outside vendors, inability to obtain transportation facilities, or other causes beyond its reasonable control whether or not similar to the foregoing.  If any force majeure condition occurs, the Party whose performance fails or is delayed because of such force majeure condition

# Exhibit 2

## INTERCONNECTION AGREEMENT UNDER SECTIONS 251 AND 252 OF THE TELECOMMUNICATIONS ACT OF 1996

by and among

# Illinois Bell Telephone Company, Indiana Bell Telephone Company Incorporated, Michigan Bell Telephone Company, Nevada Bell, The Ohio Bell Telephone Company, Pacific Bell Telephone Company, The Southern New England Telephone Company, Southwestern Bell Telephone Company, Wisconsin Bell, Inc. d/b/a Ameritech Wisconsin

and

# Sprint Communications Company L.P.

**5.    EFFECTIVE DATE**

5.1    The Effective Date of this Agreement shall be the date this Agreement is deemed approved under Section 252(e)(4) of the Act or, if this is not a successor Agreement between these Parties in the applicable State or if **SBC-13STATE** is not providing CLEC services under it's preexisting Agreement with **SBC-13STATE**, then ten (10) calendar days after the Commission approves this Agreement under Section 252(e) of the Act.  Provided however, **SBC-13STATE** shall have a reasonable time to implement new services, UNEs or load new rates.

5.2    The term of this Agreement shall commence upon the Effective Date of this Agreement and shall expire on November 30, 2004 (the "Term").  Absent the receipt by one Party of written notice from the other Party within 180 calendar days prior to the expiration of the Term to the effect that such Party does not intend to extend the Term, this Agreement shall remain in full force and effect on and after the expiration of the Term until terminated by either Party pursuant to Section 5.3 or 5.4.

5.3    Notwithstanding any other provision of this Agreement, either Party may terminate this Agreement and the provision of any Interconnection, Resale Services, Network Elements, functions, facilities, products or services provided pursuant to this Agreement, at the sole discretion of the terminating Party, in the event that the other Party fails to perform a material obligation or breaches a material term of this Agreement and the other Party fails to cure such nonperformance or breach within forty-five (45) calendar days after written notice thereof.  Any termination of this Agreement pursuant to this Section 5.3 shall take effect immediately upon delivery of written notice to the other Party that it failed to cure such nonperformance or breach within forty-five (45) calendar days after written notice thereof.

5.4    Termination for Reasons Other than Default

5.4.1    If pursuant to Section 5.2, this Agreement continues in full force and effect after the expiration of the Term, either Party may terminate this Agreement after delivering written notice to the other Party of its intention to terminate this Agreement, subject to Sections 5.5 and 5.6.  Neither Party shall have any liability to the other Party for termination of this Agreement pursuant to this Section 5.4 other than its obligations under Sections 5.5 and 5.6.

5.5    Upon termination or expiration of this Agreement in accordance with Sections 5.2, 5.3 or 5.4;

5.5.1    Each Party shall continue to comply with its obligations set forth in Section 42; and

5.5.2   Each Party shall promptly pay all amounts owed under this Agreement or place any Disputed Amounts into an escrow account that complies with Section 8.4 hereof;

5.5.3   Each Party's confidentiality obligations shall survive; and

5.5.4   Each Party's indemnification obligations shall survive.

5.6   If either Party serves notice of expiration pursuant to Section 5.2 or Section 5.4, **SPRINT** shall have ten (10) calendar days to provide **SBC-13STATE** written confirmation if **SPRINT** wishes to pursue a successor agreement with **SBC-13STATE** or terminate its agreement. **SPRINT** shall identify the action to be taken on each applicable (13) state(s). If **SPRINT** wishes to pursue a successor agreement with **SBC-13STATE**, **SPRINT** shall attach to its written confirmation or notice of expiration/termination, as applicable. a written request to commence negotiations with **SBC-13STATE** under Sections 251/252 of the Act and identify each of the state(s) the successor agreement will cover. Upon receipt of **SPRINT**'s Section 252(a)(1) request, the Parties shall commence good faith negotiations on a successor agreement.

5.7   The rates, terms and conditions of this Agreement shall continue in full force and effect until the earlier of (i) the effective date of its successor agreement, whether such successor agreement is established via negotiation, arbitration or pursuant to Section 252(i) of the Act; or (ii) the date that is ten (10) months after the date on which **SBC-13STATE** received **SPRINT**'s Section 252(a)(1) request; provided, however, when a successor agreement becomes effective, the terms, rates and charges of such successor Agreement shall apply retroactively back to the date this Agreement is terminated or expires, whichever is later, and that the retroactive true-up shall be completed within ninety (90) calendar days following the effective date of such successor Agreement.

5.8   If at any time during the Section 252(a)(1) negotiation process (prior to or after the expiration date or termination date of this Agreement), **SPRINT** withdraws its Section 252(a)(1) request, **SPRINT** must include in its notice of withdrawal a request to adopt a successor agreement under Section 252(i) of the Act or affirmatively state that **SPRINT** does not wish to pursue a successor agreement with **SBC-13STATE** for a given state. The rates, terms and conditions of this Agreement shall continue in full force and effect until the later of: 1) the expiration of the term of this Agreement, or 2) the expiration of ninety (90) calendar days after the date **SPRINT** provides notice of withdrawal of its Section 252(a)(1) request. If the Term of this Agreement has expired, on the earlier of (i) the ninety-first (91st) calendar day following **SBC-13STATE**'s receipt of **SPRINT**'s notice of withdrawal of its Section 252(a)(1) request or (ii) the effective date of the agreement following approval by the Commission of the adoption of an agreement under 252(i), the Parties shall have no

further obligations under this Agreement except those set forth in Section 5.5 of this Agreement.

5.9     If **SPRINT** does not affirmatively state that it wishes to pursue a successor agreement with **SBC-13STATE** in its, as applicable, notice of expiration or termination or the written confirmation required after receipt of the SBC owned ILEC's notice of expiration or termination, then the rates, terms and conditions of this Agreement shall continue in full force and effect until the later of 1) the expiration of the Term of this Agreement, or 2) the expiration of ninety (90) calendar days after the date **SPRINT** provided or received notice of expiration or termination. If the Term of this Agreement has expired, on the ninety-first (91st) day following **SPRINT** provided or received notice of expiration or termination, the Parties shall have no further obligations under this Agreement except those set forth in Section 5.5 of this Agreement.

5.10    In the event of termination of this Agreement pursuant to Section 5.9, **SBC-13STATE** and **SPRINT** shall cooperate in good faith to effect an orderly transition of service under this Agreement; provided that **SPRINT** shall be solely responsible (from a financial, operational and administrative standpoint) to ensure that its End Users have been transitioned to a new LEC by the expiration date or termination date of this Agreement.

## 6.    END USER FRAUD

6.1     **SBC-13STATE** shall not be liable to CLEC for any fraud associated with CLEC's End User's account, including 1+ IntraLATA toll, ported numbers, and Alternate Billing Service (ABS).  ABS is a service that allows End Users to bill calls to account(s) that might not be associated with the originating line.  There are three types of ABS calls:  calling card, collect, and third number billed calls.

6.2     The Parties agree to cooperate with one another to investigate, minimize, and take corrective action in cases of fraud involving 1+ IntraLATA toll calls, ABS, and ported numbers. The Parties' fraud minimization procedures are to be cost-effective and implemented so as not to unduly burden or harm one Party as compared to the other.

6.3     In cases of suspected fraudulent activity by an End User, at a minimum, the cooperation referenced in Section 6.2 will include providing to the other Party, upon request, information concerning Customers who terminate services to that Party without paying all outstanding charges.  The Party seeking such information is responsible for securing the End User's permission to obtain such information.

6.4     **SBC-AMERITECH**, **SBC-SWBT**, **PACIFIC**, **SNET** will provide notification messages to **SPRINT** on suspected occurrences of ABS-related fraud on **SPRINT**

# Exhibit 3

# AGREEMENT FOR INTERCONNECTION

**by and between**

## Sprint Spectrum L.P.

**and**

Illinois Bell Telephone d/b/a SBC Illinois, Indiana Bell
Telephone Company Incorporated d/b/a SBC Indiana,
Michigan Bell Telephone Company d/b/a SBC Michigan,
Nevada Bell Telephone Company d/b/a SBC Nevada, The
Ohio Bell Telephone Company d/b/a SBC Ohio, Pacific
Bell Telephone Company d/b/a SBC California, The
Southern New England Telephone Company, and
Southwestern Bell Telephone, L. P. d/b/a SBC Texas, SBC
Arkansas, SBC Kansas, SBC Oklahoma and SBC Missouri,
Wisconsin Bell, Inc. d/b/a SBC Wisconsin

immediately invalidated, modified or stayed as required to effectuate the subject order upon the written request of either Party ("Written Notice"). With respect to any written notices hereunder, the Parties shall have sixty (60) days from the Written Notice to attempt to negotiate and arrive at an agreement on the appropriate conforming modifications to the Agreement. If the Parties are unable to agree upon the conforming modifications required within sixty (60) days from the Written Notice, any disputes between the Parties concerning the interpretation of the actions required or the provisions affected by such order shall be resolved pursuant to the dispute resolution process provided for in this Agreement.

## 19.   MISCELLANEOUS PROVISIONS

### 19.1   Effective Date

19.1.1  The Effective Date of this Agreement (the "Effective Date") shall be the date the Commission approves this Agreement under Section 252(e) of the Act or, absent such Commission approval, the date this Agreement is deemed approved under Section 252(e)(4) of the Act.

### 19.2   Term and Termination

19.2.1  The Term of this Agreement shall commence upon the Effective Date of this Agreement and shall expire on 31st day of November 30, 2004 (the **"Term"**). This Agreement shall expire if either Party provides written notice, within one hundred-eighty (180) Days prior to the expiration of the Term, to the other Party to the effect that such Party does not intend to extend the Term. Absent the receipt by one Party of such written notice, this Agreement shall remain in full force and effect on and after the expiration of the Term, subject to the provisions of this Section 19.

19.2.2  Notwithstanding any other provision of this Agreement, either Party (at its sole discretion) may terminate this Agreement, and the provision of Interconnection and services, in the event the other Party (1) fails to perform a material obligation or breaches a material term of this Agreement and (2) fails to cure such nonperformance or breach within forty-five (45) Days after written notice thereof. Should the nonperforming or breaching Party fail to cure within forty-five (45) Days after such written notice, the noticing Party may thereafter terminate this Agreement immediately upon delivery of a written termination notice.

19.2.3  If pursuant to Section 19.2.1, this Agreement continues in full force and effect after the expiration of the Term, either Party may terminate this Agreement after delivering written notice to the other Party of its intention to terminate this Agreement, subject to Sections 19.2.4 and 19.2.5. Neither Party shall have any liability to the other Party for termination of this Agreement pursuant to this Section 19.2.3 other than its obligations under Sections 19.2.4 and 19.2.5.

19.2.4   Upon termination or expiration of this Agreement in accordance with Sections 19.2.1, 19.2.2 or 19.2.3:

  19.2.4.1   Each Party shall continue to comply with its obligations set forth in Section 19.9, "Survival of Obligations"; and

  19.2.4.2   Each Party shall promptly pay all amounts owed under this Agreement, subject to Section 17, "Dispute Resolution".

19.2.5   If **SBC-13STATE** serves notice of expiration or termination pursuant to Section 19.2.1 or Section 19.2.3, Carrier shall provide **SBC-13STATE** written confirmation, within ten (10) Days, that Carrier either wishes to (1) commence negotiations with **SBC-13STATE**, or adopt an agreement, under Sections 251/252 of the Act, or (2) terminate its agreement.  Carrier shall identify the action to be taken for each affected agreement identified in **SBC-13STATE**'s notice.

19.2.6   If Carrier serves notice of expiration or termination pursuant to Section 19.2.1 or Section 19.2.3, and also wishes to pursue a successor agreement with **SBC-13STATE**, Carrier shall include a written request to commence negotiations with **SBC-13STATE**, or adopt an agreement, under Sections 251/252 of the Act and identify which state(s) the successor agreement will cover. Upon receipt of Carrier's Section 252(a)(1) request, the Parties shall commence good faith negotiations on a successor agreement.

19.2.7   The rates, terms and conditions of this Agreement shall continue in full force and effect until the earlier of (i) the effective date of its successor agreement, whether such successor agreement is established via negotiation, arbitration or pursuant to Section 252(i) of the Act; or (ii) the date that is ten (10) months after the date on which **SBC-13STATE** received Carrier's Section 252(a)(1) request, at which time the Agreement shall terminate without further notice.

19.2.8   If at any time during the Section 252(a)(1) negotiation process (prior to or after the expiration date or termination date of this Agreement), Carrier withdraws its Section 252(a)(1) request, Carrier must include in its notice of withdrawal a request to adopt a successor agreement under Section 252(i) of the Act or affirmatively state that Carrier does not wish to pursue a successor agreement with **SBC-13STATE** for a given state. The rates, terms and conditions of this Agreement shall continue in full force and effect until the later of: 1) the expiration of the Term of this Agreement, or 2) the expiration of ninety (90) Days after the date Carrier serves notice of withdrawal of its Section 252(a)(1) request. If the Term of this Agreement has expired, on the earlier of (i) the ninety-first (91st) Day following **SBC-13STATE** receipt of Carriers notice of withdrawal of its Section 252(a)(1) request or (ii) the effective date of the agreement following approval by the Commission of the adoption of an agreement under 252(i), the Parties shall, have no further

obligations under this Agreement except those set forth in Section 19.2.4 of this Agreement.

19.2.9 If Carrier does not affirmatively state that it wishes to pursue a successor agreement with **SBC-13STATE** as provided in Section 19.2.4.1 or Section 19.2.4.2 above, then the rates, terms and conditions of this Agreement shall continue in full force and effect until the later of 1) the expiration of the Term of this Agreement, or 2) the expiration of ninety (90) Days after the date Carrier provided or received notice of expiration or termination. Thereafter, the Parties shall have no further obligations under this Agreement except as provided in Section 19.2.4 above.

19.2.10 In the event of expiration or termination of this Agreement when there is no successor agreement between **SBC-13STATE** and Carrier, **SBC-13STATE** and Carrier shall cooperate in good faith to effect an orderly transition of service under this Agreement; provided, Carrier shall be solely responsible (from a financial, operational and administrative standpoint) to ensure that its End User Customers are transitioned to another Telecommunications Carrier, if applicable.

19.3 Access Carrier Name Abbreviation and Operating Company Number.

19.3.1 The complete list of Carrier's Access Carrier Name Abbreviation (ACNA) codes and Operating Company Number (OCN) that are covered by this Agreement are listed below. Any addition, deletion or change in name associated with these listed ACNA/OCN codes requires notice to **SBC-13STATE**. Notice must be received before orders can be processed under a new or changed ACNA/OCN code.

| | **ACNA List** | **OCN** |
|---|---|---|
| Indiana | MJC, HZC, UBQ | 6664, 8446, 6953 |
| Michigan | MJC, HZC, IIP | 6664, 8452, 6953, 4659 |
| Wisconsin | MJC, LPL, SWQ, WOW, ROW | 6664, 8463, 4014, 4659 |
| Nevada | MJC, LPL, SWQ, WOW, ROW UBQ | 6664, 4099 |
| Ohio | MJC, HZC | 6664, 8568, 6953 |
| Connecticut | MJC | 6664, 4063 |
| Arkansas | MJC, LPL, SWQ, WOW, ROW | 6664, 8442, 4014, 6510 |
| Kansas | MJC, LPL, SWQ, WOW, ROW | 6664, 8448, 4014 |
| Missouri | MJC, LPL, SWQ, WOW, ROW, IIP | 6664, 8454, 4014, 4659 |
| Oklahoma | MJC, LPL, SWQ, WOW, ROW | 6664, 8456, 4014, 6510 |
| Texas | MJC, LPL, SWQ, WOW, ROW WEL | 6664, 8460, 4014, 6510 |

19.4 Binding Effect

19.4.1 This Agreement will be binding on and inure to the benefit of the respective successors and permitted assigns of the Parties.