# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE SOUTHERN NEW ENGLAND
TELEPHONE COMPANY, d/b/a AT&T
CONNECTICUT,
     Plaintiff,

v.

ANTHONY J. PALERMINO, KEVIN M.
DELGOBBO, and JOHN W. BETKOSKI,
III, in their official capacities; SPRINT
COMMUNICATIONS COMPANY L.P.;
SPRINT SPECTRUM L.P.; and NEXTEL
COMMUNICATIONS OF THE MID-
ATLANTIC, INC.,
     Defendants.

No. 3:09cv1672 (SRU)

## MEMORANDUM OF DECISION

Southern New England Telephone Company, doing business as AT&T Connecticut

("SNET"), filed a complaint on October 19, 2009 seeking a declaratory judgment that the

commissioners of the Connecticut Department of Public Utility Control ("DPUC") wrongly

interpreted a Federal Communications Commission ("FCC") order to require SNET to extend its

interconnections agreements ("ICAs") with Sprint Communications Company L.P., Sprint

Spectrum L.P., and Nextel Communications of the Mid-Atlantic, Inc. (collectively, "Sprint") for

three years beginning September 16, 2009. SNET also seeks an order enjoining enforcement of

the DPUC's ruling. For the reasons set forth herein, SNET is entitled to the declaratory and

injunctive relief it seeks.

## I.     Background

This case presents a dispute regarding the extension of ICAs between two

telecommunications providers, SNET and Sprint. SNET is the incumbent local exchange carrier

("ILEC") in Connecticut; Sprint is the competitive local exchange carrier ("CLEC") seeking

continued access to SNET's network.  The three individual defendants, Anthony J. Palermino, Kevin DelGobbo, and John Betkoski, are commissioners of DPUC, the agency responsible for regulating telecommunications in the state; SNET has sued them in their official capacities in order to obtain declaratory and injunctive relief.

At issue is the effect of Federal Communications Commission ("FCC") merger commitments to which AT&T, Inc., SNET's ultimate corporate parent, agreed when it merged with BellSouth Corporation in 2006.  Those merger commitments were ordered pursuant to 47 U.S.C. § 214(c), which provides in relevant part that the FCC "may attach to the issuance of the certificate" for a common carrier's acquisition of a new line "such terms and conditions as in its judgment the public convenience and necessity may require."  *See In re AT&T Inc. & BellSouth Corp., Application for Transfer of Control (AT&T Merger Order)*, FCC 06-189, 2007 FCC LEXIS 2363, at *33-*34 & n.78 (Fed. Commc'ns Comm'n Mar. 26, 2007) (describing FCC's statutory power "to impose and enforce narrowly tailored, transaction-specific conditions that ensure that the public interest is served" by the merger); *id.* at *410 (accepting AT&T's merger commitments because FCC finds that they "will serve the public interest").  Those commitments mandate AT&T to extend its existing ICAs with CLECs for a period of time following its merger with BellSouth.  The relevant provision, merger commitment 7.4, is found in Appendix F to the FCC memorandum and order approving the AT&T-BellSouth merger and is excerpted here:

> The AT&T/BellSouth ILECs shall permit a requesting telecommunications carrier to extend its current interconnection agreement, regardless of whether its initial term has expired, for a period of up to three years, subject to amendment to reflect prior and future changes of law.  During this period, the interconnection agreement may be terminated only via the carrier's request unless terminated pursuant to the agreement's "default" provisions.

*Id.* at *418.

Merger commitment 7.4, like all of the commitments to which AT&T agreed, is subject to the overarching limitation that "unless otherwise expressly stated to the contrary, all conditions and commitments . . . are enforceable by the FCC and would apply in the AT&T/BellSouth in-region territory, as defined herein, for a period of forty-two months from the Merger Closing Date and would automatically sunset thereafter." *Id.* at *410. The Merger Closing Date was December 29, 2006. Finally, the FCC stated that the merger commitments were not intended to change any jurisdictional assignments under the Telecommunications Act:

> It is not the intent of these commitments to restrict, supersede, or otherwise alter state or local jurisdiction under the Communications Act of 1934, as amended, or over the matters addressed in these commitments, or to limit state authority to adopt rules, regulations, performance monitoring programs, or other policies that are not inconsistent with these commitments.

*Id.*

By August 2007, each of Sprint's Connecticut ICAs with SNET had expired. Nevertheless, SNET and Sprint continued their interconnection arrangement pursuant to the ICAs' provisions permitting Sprint to access SNET's network on the same terms and conditions following the ICAs' expirations. The provisions, however, also allowed SNET to terminate Sprint's post-expiration network access by giving notice to Sprint of its intent to terminate. SNET notified Sprint of its intent to terminate Sprint's access to its network in August 2007. Under the expired ICAs, Sprint and SNET then had a window of time to negotiate a new ICA before Sprint would lose access to SNET's network. By June 30, 2008, that window of time had closed on all of Sprint's ICAs, and Sprint's right to access SNET's network had terminated.

In December 2007, in the midst of its negotiations for new ICAs with SNET, Sprint filed a complaint with the DPUC seeking to enforce merger commitment 7.1 against SNET. Merger commitment 7.1 states:

> The AT&T/BellSouth ILECs shall make available to any requesting telecommunication carrier any entire effective interconnection agreement, whether negotiated or arbitrated, that an AT&T/BellSouth ILEC entered into in any state in the AT&T/BellSouth 22-state ILEC operating territory, subject to state-specific pricing and performance plans and technical feasibility, and provided, further, that an AT&T/BellSouth ILEC shall not be obligated to provide pursuant to this commitment any interconnection arrangement or UNE unless it is feasible to provide, given the technical, network, and OSS attributes and limitations in, and is consistent with the laws and regulatory requirements of, the state for which the request is made.

*Id.* at *418. That merger commitment is a so-called "porting" provision: it requires SNET to provide a CLEC in Connecticut, such as Sprint, the same ICA that AT&T entered into with a CLEC in a different state, subject to certain modifications based on Connecticut-specific circumstances. In this case, Sprint sought to port in an ICA it had negotiated with AT&T in Kentucky. In October 2008, the DPUC ordered SNET to port in the Kentucky ICA, but left it to SNET and Sprint to negotiate the remaining Connecticut-specific terms.

Because the DPUC issued its order in October 2008, the original ICAs between SNET and Sprint had all terminated. But although Sprint's contractual rights to continue accessing SNET's network had extinguished, Sprint continued to access SNET's network according to the terms of the expired ICAs while the parties negotiated new ICAs. By March 2009, the negotiations between SNET and Sprint over the Connecticut-specific terms of the ported ICA had broken down and, on May 21, 2009, Sprint filed a new complaint before the DPUC. That complaint sought an order from the DPUC extending Sprint's terminated ICAs with SNET another three years pursuant to merger commitment 7.4. SNET opposed that extension, arguing, *inter alia*, that there were no "current interconnection agreement[s]" to be extended under merger commitment 7.4 because Sprint's contractual rights to access SNET's network terminated June 30, 2008, nearly a year before Sprint filed its complaint for the three-year extensions.

The DPUC decided Sprint's complaint on September 16, 2009, and held that Sprint was entitled to three-year extensions of its ICAs. The DPUC found the existence of "current interconnection agreement[s]" subject to merger commitment 7.4 because, although SNET and Sprint did not have an existing contractual arrangement, the two carriers were operating pursuant to the terms of an implicit agreement the terms of which were same as the expired ICAs. The DPUC also determined that Sprint made its request within the merger commitments' 42-month window and, therefore, SNET was bound to offer the three-year extensions. The DPUC then concluded that, when an ILEC requests to extend an extant ICA with SNET pursuant to merger commitment 7.4, that extension commences on the date that the parties agree to or the state commission orders the extension (here, September 16, 2009), as opposed to the closing date of the AT&T/BellSouth merger (i.e., December 29, 2006), the date of the current ICA's termination (i.e., June 30, 2008), or the date the extension was requested (i.e., May 21, 2009).

On October 19, 2009, SNET filed a complaint for declaratory and injunctive relief in federal district court. That complaint — which is styled as an original civil action, rather than an appeal of the DPUC ruling — seeks to invalidate the DPUC's decision on the merits. In the briefing that followed, however, both parties treated SNET's action as if it were an appeal of the DPUC's order, and limited their discussion to the merits of the DPUC's interpretation of the merger commitments without addressing the case's procedural posture. At oral argument, the court inquired whether the DPUC had jurisdiction to enforce the merger commitments or whether enforcement was relegated to the FCC, and whether the district court had jurisdiction to review the DPUC's ruling. Because the parties did not brief those jurisdictional questions and the DPUC did not consider them, on February 19, 2010 I remanded the case to the DPUC for further consideration of its jurisdictional basis; I also requested that the DPUC clarify the

grounds for its September 16, 2009 decision that Sprint was entitled to a three-year extension of its ICA from the date of the DPUC's ruling.[1] (Doc. # 32.) Following that remand, the DPUC issued a decision on June 9, 2010 (docketed on June 10, 2010). That decision clarified its jurisdiction to enforce the merger commitments and essentially restated its previous reasoning that Sprint is entitled to extend its ICAs for three years after September 16, 2009.

SNET thereafter filed new briefing in this court arguing for declaratory and injunctive relief. Following oral argument, and with the DPUC's clarified decision in hand, I now decide the merits of the case.

## II.     Standard of Review

The court reviews *de novo* the DPUC's interpretation of federal law. *Global NAPS, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 96 (2d Cir. 2006). All other issues, such as interpretation of fact or resolution of state law claims, are reviewed under the arbitrary and capricious standard. *Id.*

## III.    Discussion

### A.      Jurisdiction

The parties are in accord that the DPUC had jurisdiction to enforce the merger commitments, and that this court has jurisdiction to review the DPUC's decision. Although the matter was not initially argued and the parties stipulate that I have jurisdiction to decide SNET's suit, the court may determine its subject matter jurisdiction *sua sponte* in order to confirm that it has the power to hear the case before it. *Jennifer Matthew Nursing & Rehabilitation Ctr. v. U.S. Dep't of Health & Human Servs.*, 607 F.3d 951, 955 (2d Cir. 2010). My discussion regarding

---

[1] In the remand order (doc. # 32), I mistakenly listed the date of the DPUC's decision — and, by extension, the commencement date for the SNET/Sprint ICAs — as September 19, 2009. The correct date should have been September 16, 2009.

jurisdiction addresses two separate questions: first, whether the DPUC had jurisdiction to enforce merger commitment 7.4; and, second, whether this court has jurisdiction to review the DPUC's ruling.

1.     *The DPUC's jurisdiction to enforce merger commitment 7.4*

Under the TCA, state commissions, such as the DPUC, have authority to adjudicate disputes between carriers concerning ICAs.  First, state commissions approve ICAs that ILECs and CLECs enter through voluntary negotiation or mandated arbitration; in particular, it is a state commission's duty to ensure that an ICA meets requirements set forth by the TCA and FCC regulations promulgated under the statute.  47 U.S.C. § 252(e)(1) & (2)(B).  State commissions also have jurisdiction to approve agreements entered into pursuant to 47 U.S.C. § 252(i), which requires an ILEC to grant a CLEC access to its network according to the same terms that the ILEC negotiated with another carrier.  *E.g.*, *Southwestern Bell Tel. Co. v. Waller Creek Cmmc'ns, Inc.*, 221 F.3d 812, 814-15 (5th Cir. 2000) (describing state commission's review of CLEC's petition for arbitration to enforce section 252(i) against ILEC).  And state commissions retain jurisdiction over "post-formation disputes involving approved interconnection agreements," such as the interpretation and enforcement of the agreements' terms.  *Core Cmmc'ns, Inc. v. Verizon Pa., Inc.*, 493 F.3d 333, 342 & n.7 (3d Cir. 2007); *accord Global NAPS, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 83 n.12 (1st Cir. 2010) (noting that "[m]ost circuits . . . have held that state commissions have [the] authority" to interpret and enforce ICAs, and citing cases); *Ill. Bell Tel. Co. v. Global NAPS Ill., Inc.*, 551 F.3d 587, 593-94 (7th Cir. 2008); *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1274 (11th Cir. 2003) (en banc).

Nowhere does the TCA reference a state commission's power to enforce the terms of an FCC merger order under 47 U.S.C. § 214(c), however.[2]  The AT&T-BellSouth merger commitments do say that the FCC has jurisdiction over matters relating to them.  *AT&T Merger Order*, at *410 ("[A]ll conditions and commitments proposed in this letter are enforceable by the FCC.").  The question, however, is whether FCC jurisdiction is exclusive or, as in the case of section 252 of the TCA, concurrent with state commissions.  *Cf.* 47 U.S.C. § 252(e)(5) (setting forth that, in the event that the state commission fails to act, the FCC can, if it issues "an order preempting the State commission's jurisdiction of that proceeding," assume responsibility for adjudicating a dispute regarding an ICA).

Recently, several courts have held that state commissions have jurisdiction to enforce the AT&T-BellSouth merger commitments.  *Michigan Bell Telephone Co. v. Isiogu*, No. 09-12577, 2010 WL 746377 (E.D. Mich. Mar. 2, 2010), provides the greatest guidance and presents similar facts to this case.  In Michigan, Sprint attempted to port in its Kentucky ICA with AT&T; when negotiations concerning porting the Kentucky agreement failed, Sprint notified AT&T that it would seek a three-year extension of its existing agreement pursuant to merger commitment 7.4.  *Id.* at *2.  Negotiations of the three-year extension quickly fizzled, and Sprint filed a petition with the state commission for arbitration of the three-year extension.  *Id.*  AT&T challenged the state commission's subject matter jurisdiction to enforce the merger commitments.  *Id.*  The *Isiogu* Court held, in relevant part, that the state commission had jurisdiction to enforce merger

---

[2] The DPUC argues that it has jurisdiction to enforce merger commitment 7.4 because the DPUC has authority under state law to regulate telecommunications generally and unbundle AT&T's network specifically.  *See* June 9, 2010 DPUC Ruling 3-4 (discussing effect of Conn. Gen. Stat. §§ 16-247a & 16-247b on DPUC's jurisdiction).  But Connecticut's grant of power to the DPUC is not germane to the issue whether *federal* law authorizes state commissions to interpret and enforce the AT&T merger commitments.

commitment 7.4 in arbitration because (1) the merger commitment only extended the term of a previously negotiated and approved ICA; (2) determining the duration of an ICA — i.e., extending its length by three years — is within the scope of a state commission's arbitration powers under the TCA; and (3) the AT&T merger commitments confirm that they are not intended to "restrict, supersede, or otherwise alter state or local jurisdiction under the Communications Act of 1934, as amended, or over the matters addressed in these commitments." *Id.* at *6 (quoting *AT&T Merger Order*, at *410).  In short, the *Isiogu* Court concluded that, "to the extent arbitral issues and the merger commitments overlap, the [state commission] retains authority to resolve those issues." *Id.*; *accord Southwestern Bell Tel. Co. v. Clayton*, No. 4:09cv871 (CEJ), 2011 WL 147897, at *6 (E.D. Mo. Jan. 18, 2011) (adopting *Isiogu*'s reasoning that state commissions may enforce merger commitment 7.4 through arbitration); *BellSouth Telecomms., Inc. v. N.C. Utils. Comm'n*, 4:09cv33-FL, 2010 U.S. Dist. LEXIS 17212, at *21-*22 (E.D.N.C. Jan. 26, 2010) (holding that state commission has concurrent jurisdiction to enforce merger commitment 7.1 because state commissions have jurisdiction to resolve opt-in disputes under 47 U.S.C. § 252(i) and the merger commitments were clear that they did not "restrict, supersede, or otherwise alter state or local jurisdiction under the Act" (quotation omitted)).  *But see* Sprint Defs. Ex. 6 at 37 (Missouri arbitrator's report) (holding by Missouri state commission that only the FCC has the power to enforce the merger commitments).

I agree that state commissions have jurisdiction to enforce the AT&T-BellSouth merger commitments.  The TCA, generally speaking, distributes jurisdiction between the FCC and state commissions over interconnection disputes within their states.

> The model under the TCA is to divide authority among the FCC and the state commissions in an unusual regime of "cooperative federalism," . . . with the intended effect of leaving state commissions free, where warranted, to reflect the policy choices made by their states. . . . Rather than placing the entire

> scope of regulatory authority in the federal government, Congress enlisted the
> aid of state public utility commissions to ensure that local competition was
> implemented fairly and with due regard to the local conditions and the
> particular historical circumstances of local regulation under the prior regime.

*Global Naps, Inc. v. Mass. Dep't of Telecomms. & Energy*, 427 F.3d 34, 46 (1st Cir. 2005)

(quotations omitted).  That system of shared jurisdiction extends to matters relating both to the

formation of new ICAs and the enforcement of extant ICAs.  *See Core*, 493 F.3d at 342

("'Disputes arising from interconnection agreements and seeking interpretation and enforcement

of those agreements are within the states' responsibility under Section 252.'" (quoting *In re*

*Starpower Cmmc'ns, LLC*, 15 F.C.C.R. 11277, 11279 (2000))).   And, as the *Isiogu* Court noted,

the AT&T-BellSouth merger order was clear that the merger commitments were not intended to

supersede, restrict, or otherwise modify state commissions' powers under the TCA.  Thus,

because merger commitment 7.4 does nothing other than extend the duration of ICAs that state

commissions have already approved, the TCA's "cooperative federalism" model, which was

unchanged by the AT&T-BellSouth merger order, leaves state commissions with the authority to

enforce the three-year extensions.  Extending the term of an ICA is at least on par with approving

or enforcing an ICA; indeed, it would make little sense for state commissions to have the

authority to hold arbitration proceedings, ultimately approve, and thereafter enforce the terms

and conditions of an ICA but lack the secondary power to extend that same ICA for an additional

three years.

But it bears mentioning that in the district court opinions holding that state commissions

have jurisdiction to enforce the AT&T-BellSouth merger commitments, the state commissions

were exercising their jurisdiction via arbitration — that is, by the procedures for resolving an

ICA dispute set forth in 47 U.S.C. § 252.  In this case, by contrast, the DPUC did not arbitrate

Sprint's petition for three-year extensions of their ICAs, but simply enforced the merger

commitments by declaring SNET's obligations under the AT&T-BellSouth merger order.  As the

DPUC put it:

> Neither Sprint nor AT&T Connecticut requested arbitration.  The [DPUC] determined that it would not be appropriate for it to require the parties to participate in an arbitration proceeding since neither party requested one. Therefore, based on its general authority to regulate telecommunications in Connecticut, and based on the authority to approve interconnection agreements, the Department determined that it had jurisdiction to issue its ruling enforcing the merger commitments.

June 9, 2010 DPUC Ruling 2.  But even if one were to accept that state commissions share

jurisdiction with the FCC to enforce the merger commitments, it may not follow that they have

jurisdiction to declare SNET's obligations in an enforcement proceeding.  Rather, the state

commissions' jurisdiction could be limited to the procedures set forth in 47 U.S.C. § 252, which

leave state commissions with two modes of operating: (1) approving agreements that carriers

have entered voluntarily or (2) arbitrating agreements when the carriers cannot consent.

There are at least two reasons, however, why the DPUC's use of an enforcement

proceeding is immaterial to the DPUC's jurisdiction to enforce merger commitment 7.4.  The

first is that section 252 does not limit to arbitration the procedures that the DPUC may use in

order to resolve ICA disputes.  On the contrary, 47 U.S.C. § 252(i) provides an expedited process

for porting in agreements that specifically does not require the "lengthy negotiation and approval

process" that the TCA otherwise prescribes for the formation of ICAs.  *In re Implementation of*

*the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and

Order, 11 F.C.C.R. 15499, ¶ 1321, 1996 WL 452885 (Fed. Cmmc'ns Cmm'n Aug. 8, 1996),

*aff'd in part and rev'd in part on other grounds*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366

(1999).  Thus, section 252 does not restrict a state commission to holding arbitration

proceedings, but envisions other procedures for resolving ICA disputes.  The second reason

supporting the DPUC's jurisdiction is that section 252 is intended to manage disputes concerning

the *formation* of an ICA. In this case, however, merger commitment 7.4 only applies to ICAs already in existence; merger commitment 7.4 does not serve to create new ICAs but only modifies existing ones. That kind of agency action does not fall within the ambit of 47 U.S.C. § 252 but is on par with state commissions' enforcement and interpretation of ICAs, which also do not require formal arbitration proceedings. *E.g.*, *BellSouth Telecomms.*, 317 F.3d at 1272-73 (describing procedural history of appeal, beginning with the state commission's orders enforcing the terms of the disputed ICA).

Therefore, the DPUC had jurisdiction to enforce merger commitment 7.4 because (1) the TCA grants state commissions jurisdiction over disputes involving the formation, interpretation, and enforcement of ICAs; (2) the AT&T-BellSouth merger commitments were explicit that they did not upset the distribution of power between the FCC and state commissions; (3) enforcing merger commitment 7.4 involves nothing more than extending the duration of an ICA that was already approved by a state commission pursuant to its authority under the TCA; and (4) it is within the state commission's power to enforce the merger commitment's three-year extension without initiating arbitration proceedings, just as it is within the state commission's power to enforce the terms of an existing ICA without arbitration. That leaves one last jurisdictional issue: whether this court has authority to review the DPUC's ruling.

2. *This court's jurisdiction to review the DPUC's ruling*

The TCA provides that "[i]n any case in which a State commission makes a determination under [47 U.S.C. § 252], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). This case does not fall within 47 U.S.C. § 252(e)(6), however, for the reasons set forth above: the

state commission did not approve a new ICA but, by enforcing merger commitment 7.4, only extended the term of an ICA already in existence. But that does not imply that the court is powerless to hear AT&T's suit because "even if § 252(e)(6) does not *confer* jurisdiction, it at least dos not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002) (emphasis in original). Section 252(e)(6) is akin to a private right of action to sue in federal court, and is not a limitation of a district court's jurisdiction to adjudicate. "Section 252 . . . does not distinctively limit the substantive relief available. . . . Indeed, it does not even mention subject-matter jurisdiction." *Id.* at 644. Therefore, the fact that AT&T is not suing pursuant to section 252(e)(6) does not mean that the court cannot decide this case. Rather, this court has another basis for jurisdiction — namely, 28 U.S.C. § 1331, which gives "district courts . . . original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

The Supreme Court's decision in *Verizon Maryland* is instructive. There, the Court addressed whether a district court had jurisdiction pursuant to section 1331 to hear the plaintiff's claim that the state commission's ruling regarding the interpretation of an existing ICA was preempted by the TCA and a subsequent FCC ruling. 535 U.S. at 642. Because "resolution of [the plaintiff's] claim turns on whether the [Telecommunications] Act, or an FCC ruling issued thereunder, precludes" the state commission's order, the Supreme Court held that the claim "thus falls within 28 U.S.C. § 1331's general grant of jurisdiction." *Id.* at 643. Here, nearly identical circumstances are presented: SNET's claim for declaratory and injunctive relief turns on the meaning and construction of an FCC order requiring SNET "to extend [a CLEC's] current interconnection agreement, regardless of whether its initial term has expired, for a period of up to

three years." *AT&T Merger Order*, 2007 FCC LEXIS 2363, at *418. SNET's claim would therefore appear to arise directly under federal law.

There is recent caselaw to the contrary, however. In *Wisconsin Bell, Inc. v. Callisto*, No. 09-cv-515-bbc, 2010 WL 3313570 (W.D. Wis. Aug. 24, 2010), the Court ruled that the AT&T-BellSouth merger commitments did not qualify as "law" within the meaning of 28 U.S.C. § 1331 and, therefore, federal subject matter jurisdiction was lacking. But *Callisto* is not persuasive for several reasons. First, in my view, *Callisto* misreads the Supreme Court's holding in *Verizon Maryland*. Contrary to *Callisto*'s analysis, *see id.* at *4, the Supreme Court did not hold that there was arising-under jurisdiction solely because the plaintiff presented a claim of preemption by a federal statute; rather, the Court held that there was federal jurisdiction under 28 U.S.C. § 1331 because the plaintiff's claim "turns on whether the [Telecommunications] Act, *or an FCC ruling issued thereunder*," preempted a decision by the state commission. *Verizon Md.*, 535 U.S. at 643 (emphasis added). Thus, *Verizon Maryland* squarely supports the proposition that an FCC order can supply the basis for federal question jurisdiction.

Second, and more importantly, *Callisto* seems to have missed a key sentence in section 214(c) that not only establishes subject matter jurisdiction but also creates a private right of action. The *Callisto* Court reasoned that, if the merger conditions created a federal question under section 1331, such a question would, at most, be limited to whether the FCC had the authority to impose the conditions and would not include the conditions' substantive meaning. "Section 214(c) may have given the FCC authority to impose conditions on plaintiff's merger, but all this means is that the FCC did not violate the law by imposing the condition. . . . Nothing in § 214(c) suggests that Congress intended to give the FCC the authority to create a 'law' that

plaintiff could use as a basis for jurisdiction under § 1331." *Callisto*, 2010 WL 3313570 at *5.

That statement, however, is belied by the text of section 214(c).

Section 214(c) provides that "[a]ny construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of . . . any party in interest." 47 U.S.C. § 214(c). In other words, a court has the power to hear and award injunctive relief in a case alleging that a party has acted in contravention of section 214, including in contravention of an FCC certificate issued under section 214(c), provided that the plaintiff is a "party in interest." *See Gottlieb v. Carnival Corp.*, 436 F.3d 335, 339 n.5 (2d Cir. 2006) (noting in dicta that section 214(c) "authorize[es an] injunction by any court of general jurisdiction for extension of lines or discontinuation of services contrary to certificates of public convenience and necessity" (quoting *Int'l Sci. & Tech. Inst., Inc. v. Inacom Commc'ns, Inc.*, 106 F.3d 1146, 1152 (4th Cir. 1997))); *Cablevision of Tex. III, L.P. v. Okla. W. Tel. Co.*, 993 F.2d 208, 210 & n.1 (10th Cir. 1993) (holding that section 214(c) gives any "party in interest," such as a competing telecommunications provider, the right to obtain in federal court an injunction compelling another party to act in accordance with the statute). In this case, SNET is a "party in interest" — after all, it is a party bound by the merger commitment — and it is seeking an injunction to ensure that any extension of Sprint's ICAs is consistent with the FCC's order issued pursuant to section 214(c). SNET's suit, in other words, falls within the injunction action contemplated by section 214(c), which on its face provides for subject matter jurisdiction and a private right of action for a party in interest such as SNET.

Third and finally, if *Callisto* were correctly decided, it would result in an odd outcome: a state commission ruling extending an ICA pursuant to a federal agency order without any federal

review.  In light of the TCA's cooperative federalism model, *Callisto* would be correct if the state commission also lacked jurisdiction to enforce merger commitment 7.4 and, thus, the only avenue for review was left with the FCC; otherwise, the federal policy captured in the merger commitments would be left to the exclusive jurisdiction of state commissions without any federal review.  *See Verizon Md., Inc. v. Global NAPS, Inc.*, 377 F.3d 355, 365 (4th Cir. 2004) ("[T]he [Telecommunications] Act took the regulation of local telephone service away from the States and established a new federal regime designed to promote competition. . . . State utility commissions have a role in this regime, but that role is subject to federal oversight." (quotation omitted)); *cf. Price v. Pierce*, 823 F.2d 1114, 1120 (7th Cir. 1987) (holding that contract between private parties but approved by federal agency pursuant to statutory authority presented a federal question and would be decided under federal law because it would be "odd" that a suit concerning contracts "fundamental to the achievement of [the agency's] objective under [federal law] would have to be brought in state court and decided in accordance with state contract law"). *Callisto*, however, did not hold that the state commission lacked jurisdiction, but limited its decision to the federal court's lack of authority to review the state commission's ruling and enforce the merger commitment.  That outcome, in addition to clashing with section 214(c)'s text and federal precedent, is inconsistent with the TCA's cooperative federalism framework. Permitting federal review of the FCC's order allows for a result more harmonious with the TCA.

For the reasons set forth above, the DPUC had jurisdiction to enforce merger commitment 7.4 against SNET, and this court has jurisdiction under 28 U.S.C. § 1331 to hear SNET's suit challenging the validity of that ruling.  I now turn to the merits: whether the DPUC correctly interpreted the merger commitment.

B.	Merits

The DPUC extended the SNET-Sprint ICAs pursuant to merger commitment 7.4 for three years beginning September 16, 2009, the date when the DPUC issued its ruling. Because this case presents a question whether the DPUC correctly interpreted a federal agency's order, the DPUC's decision is reviewed *de novo*. *See Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 94 (2d Cir. 2006) ("Courts first review de novo whether the state agency complied with requirements of the relevant federal law.").

At issue is the the meaning of the first sentence of merger commitment 7.4: "The AT&T/BellSouth ILECs shall permit a requesting telecommunications carrier to extend its current interconnection agreement, regardless of whether its initial term has expired, for a period of up to three years . . . ." The sentence presents two potential interpretative ambiguities: the meaning of the phrases "current interconnection agreement" and "for a period of up to three years." I need only address the latter, however, because it is dispositive.[3]

Sprint argues that the phrase "for a period of up to three years" means three years from the time the CLEC makes its request for the three-year extension, although it is unclear whether Sprint would count March 30, 2009, when it made the extension request to SNET, or May 21, 2009, when it filed the DPUC complaint, as the extension's beginning date. The DPUC defendants argue that the phrase means three years from the date the extension request is granted, which is how the DPUC arrived at the September 16, 2009 date for the commencement of the extension. Under either Sprint's or the DPUC's interpretation, merger commitment 7.4 would

---

[3] SNET argues that, if September 16, 2009 marked the beginning of the three-year extension period, then the DPUC could not have extended Sprint's ICAs because on that date all of Sprint's ICAs with SNET had expired and, therefore, there was no "current interconnection agreement" subject to merger commitment 7.4. Because I do not hold that September 16, 2009 was the date of extension, I need not address that issue.

permit a requesting CLEC to extend its ICA by three years, so long as that date fell within 42 months of the merger's closing. *See AT&T Merger Order*, 2007 FCC LEXIS 2363, at *410 ("[A]ll conditions and commitments . . . would apply . . . for a period of forty-two months from the Merger Closing Date and would automatically sunset thereafter.").

In its initial briefing, SNET agreed with the DPUC that the phrase "for a period of up to three years" referred to the three years following September 16, 2009, but maintained that, because there was no "current interconnection agreement" in effect at that time, no extension could be granted. Following the DPUC's June 9, 2010 decision, however, SNET now contends that the phrase refers to the three-year period following the merger closing date, December 29, 2006.[4] On that interpretation, merger commitment 7.4 permits all CLECs with ICAs at the time of the merger closing date to request an extension of their agreements for up to three years, or until December 29, 2009. In other words, all eligible CLECs are entitled to continue their ICAs for three years following the merger closing date, regardless when their ICAs expired or are set to expire.

SNET offers the best interpretation of merger commitment 7.4, and it is the one I adopt in this memorandum of decision. On the face of the merger commitment, there is no way to tell precisely what the phrase "for a period of up to three years" means with respect to when the contemplated three-year extension should begin. Sprint's best argument for why its interpretation — i.e., that the phrase means three years from the date the CLEC requests the extension — is correct is that the merger commitments are, unless expressly stated otherwise, effective for a 42-month period from the closing date. SNET's interpretation would leave

---

[4] At oral argument on February 18, 2010, I had proposed this interpretation, but left the issue undecided. *See* Tr. of 2/18/10 Oral Argument, at 4/9-5/6 (doc. # 33).

merger commitment 7.4 effective for only 36 months without any express statement that the 42-month window does not apply. Furthermore, Sprint demonstrates that, elsewhere in the merger order, when the FCC intended for a merger commitment to last for a period other than 42 months it made the point clearly. *See* Br. for Sprint Defs. Re: DPUC June 9, 2010 Decision on Remand 15 n.5 (doc. # 41) (discussing merger commitment 13.1, *AT&T Merger Order*, 2007 FCC LEXIS 2363, at *435, which features an express time limit of "a period of three years *after the Merger Closing Date*" (emphasis added)).

Sprint's argument, however, lacks force for two reasons. First, merger commitment 7.4 does appear to provide an expressly different window for the term of its enforcement: an extension is available "for a period of up to three years" for ICAs that are "current" as of the merger closing date. *AT&T Merger Order*, 2007 FCC LEXIS 2363, at *418. All that merger commitment 7.4 needs to make that point more plainly is the insertion of the words "after the Merger Closing Date" following "three years." Of course, the FCC's use of the words "after the Merger Closing Date" to override the default 42-month window in other parts of the merger order, *e.g.*, *id.* at *435, does undercut SNET's position; the expression of the words "after the Merger Closing Date" in one section of the merger order could be used to imply its exclusion in another. *See Cordiano v. Metacon Gun Club, Inc.* 575 F.3d 199, 221 (2d Cir. 2009) (applying the principle of *expression unius est exclusion alterius* in context of federal regulation). That objection to SNET's interpretation is overcome, however, by the second problem in Sprint's argument: Sprint's interpretation runs opposite to the FCC's intent in ordering merger condition 7.4, especially when the merger condition is read as a whole. *See Ibragimov v. Gonzalez*, 476 F.3d 125, 136-37 (2d Cir. 2007) (rejecting petitioner's argument because it was inconsistent with

the statutory and regulatory framework and the "agency's intent" in promulgating its regulations).

Merger commitment 7.4 is one of four commitments included to "reduc[e] transaction costs associated with interconnection agreements." *AT&T Merger Order*, 2007 FCC LEXIS 2363, at *417. Under SNET's interpretation, merger commitment 7.4 serves that end by giving CLECs three years from the merger closing date to renegotiate their ICAs, which allows a period of time for CLECs to become accustomed to their networks' new ownership, to eliminate uncertainty regarding their networks' newly merged owners, to deter hasty actions to renegotiate ICAs while the merger's dust is still settling, and to prevent the newly-merged AT&T from exercising leverage over CLECs by threatening to terminate their ICAs. Indeed, it is apparent that the FCC was concerned that CLECs on AT&T's and BellSouth's networks might be pressured to renegotiate their ICAs immediately following the merger. That concern is addressed by inclusion of the second sentence of merger commitment 7.4, which prescribes that, during the extension period, ICAs "may be terminated only via the carrier's," i.e., the CLEC's, "request unless terminated pursuant to the agreement's 'default' provisions." *Id.* at *418. In other words, merger commitment 7.4 operates to reduce transaction costs on all sides by giving parties to existing ICAs up to three years from the merger closing date to determine their bargaining positions and interests, and specifically protects CLECs — who, as the non-incumbents, have weaker bargaining power — from being compelled to negotiate new ICAs on the threat that their access to AT&T's network will be terminated.

Sprint's interpretation, however, would go far beyond simply reducing transaction costs. Instead, it would work to give CLECs a mighty bargaining advantage over AT&T. Consider the example of a Sprint ICA that, as of December 29, 2006, would last another five years, until

December 29, 2011.  If Sprint's interpretation were adopted, merger commitment 7.4 would entitle it to demand from SNET a three-year extension (so long as the request was made within 42 months of the merger closing date) on top of its remaining five years, bringing the agreement to a whopping eight years in length.  Furthermore, only Sprint would have the right to terminate the agreement (barring a default) during the three-year extension period.  In short, Sprint could put off having to negotiate a new ICA at the end of its contractual five-year term and then have sole veto power during the additional three years it obtained under merger commitment 7.4, giving it a very strong hand in the event AT&T wanted to bargain for a new deal at what otherwise would have been the contract's termination.

Sprint's interpretation does not align with the purpose of merger commitment 7.4.  The FCC's point in imposing the merger condition was not to lock in existing ICAs for extended periods of time, deny ILECs the opportunity to negotiate new ICAs, or tilt the bargaining table heavily in CLECs' favor.  On the contrary, the purpose was to reduce future transaction costs by allowing AT&T and its CLECs the opportunity to take their time and think through their positions following the AT&T/BellSouth merger, and bar AT&T from terminating CLECs' interconnection rights immediately following the merger.  SNET's proposed interpretation better serves merger commitment 7.4's purpose.

Finally, SNET's proposed interpretation eliminates confusion about when the extension commences.  There is nothing in the text of "for a period of up to three years" that establishes whether an existing ICA should be extended from the date that the extension request was made to AT&T, the date the CLEC's complaint was filed with the state commission, or the date of the state commission's decision.  Sprint and the DPUC lack any textual or purposive foundation for the beginnings of their proposed extension periods and, instead, arbitrarily selected dates from

when their three-year extensions should commence.  By contrast, reading merger commitment 7.4 to extend by three years all ICAs current as of the merger closing date — that is, until December 29, 2009 — follows more easily from the merger commitment's text, which makes no reference to a beginning point for the three-year extension and does not indicate that the "period of up to three years" will have different beginning and ending dates for different CLECs across the country depending on when a particular CLEC requested an extension.  SNET's interpretation also provides a result that is administratively simpler, which is more consistent with the merger commitment's purpose of reducing transaction costs.

The DPUC's decision extending the ICAs between SNET and Sprint by three years from September 16, 2009 incorrectly interpreted merger commitment 7.4.  Properly read, the phrase "for a period of up to three years" grants CLECs a potential maximum three-year extension of their ICAs from December 29, 2006, the merger closing date.  SNET is entitled to a declaratory judgment regarding its obligations under merger commitment 7.4 because this case presents an "actual controversy within [the court's] jurisdiction" in which "the court may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a). Furthermore, SNET is entitled to a permanent injunction barring the DPUC defendants from enforcing the DPUC's rulings of September 16, 2009 and June 9, 2010 granting Sprint three-year extensions beginning September 16, 2009.  "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted."  *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (quotation omitted). In this case, the defendants have not challenged the type of relief SNET seeks and have implicitly conceded that, if SNET were to prevail and its interpretation of merger commitment 7.4 be adopted, SNET would have been irreparably harmed by the DPUC's ruling and it would

be without an adequate remedy at law. Furthermore, SNET's private right of action under section 214(c) explicitly contemplates that injunctive relief will be required in a case such as this one. *See* 47 U.S.C. § 214(c) ("Any construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section *may be enjoined* by any court of competent jurisdiction . . . ." (emphasis added)). The only remedy that will make SNET whole is an injunction barring enforcement of the DPUC's erroneous rulings regarding its obligations under the AT&T-BellSouth merger order. All the requirements for injunctive relief have been met in this case.

## IV.     Conclusion

For the foregoing reasons, declaratory judgment will issue in favor of SNET that merger commitment 7.4 entitles Sprint to a three-year extension of its ICAs from the merger closing date, i.e., until December 29, 2009. That declaration "shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a). SNET is also entitled to a permanent injunction enjoining the DPUC defendants, Anthon J. Palermino, Kevin M. DelGobbo, and John W. Betkoski, III, from enforcing against SNET the DPUC's rulings of September 16, 2009 and June 9, 2010. The clerk shall enter judgment and close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 4th day of February 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge